**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____,

TIMOTHY D. ALGUIRE,

                              Plaintiff,

        v.                                            No. 7:14-CV-1580
                                                      (GLS/CFH)

CAROLYN W. COLVIN, Commissioner of
Social Security

                              Defendant.

_____

**APPEARANCES:**                          **OF COUNSEL:**

Conboy, McKay Law Firm                    LAWRENCE D. HASSELER, ESQ.
Carthage Office
307 State Street
Carthage, New York 13619
Attorneys for Plaintiff

Social Security Administration            AMANDA J. LOCKSHIN, ESQ.
Office of Regional General Counsel,
Region II
26 Federal Plaza - Room 3904
New York, New York 10278
Attorneys for Defendant

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

**REPORT-RECOMMENDATION AND ORDER**[1]

        Plaintiff Timothy Donald Alguire ("Alguire") brings this action pursuant to 42 U.S.C. §

405 (g) seeking review of the decision by the Commissioner of Social Security

("Commissioner") denying his application for disability insurance benefits ("DIB") under the

---

        [1] This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C.
§ 636 (b) and N.D.N.Y.L.R. 72.3 (c).

Social Security Act ("Act").  Alguire moves for a finding of disability, and the Commissioner cross moves for judgment on the pleadings.  Dkt. Nos. 11, 15.  For the following reasons, it is recommended that the matter be remanded to the Commissioner.

## I.  Background

## A.  Facts

Alguire was born on March 3, 1980.  Dkt . No. 8-2 at 27.[2]  He was thirty years old on the alleged disability onset date of February 13, 2011.  Id. at 12.  Alguire attended high school and completed the tenth grade.  Id. at 28.  He did not receive a GED or any other certificate of training after high school.  Id.  Alguire is married.  Id. at 27 . He resides with his wife and their five children, aged three, five, nine, twelve, and fourteen at the time of the hearing.  Id.  Alguire last worked in February 2011, when he was employed as a bartender at the Akewesane Mohawk Casino.  Id. at 29.  He previously worked for five years at Friar's as a bartender.  Id. at 30.  He also worked at AAA.  Id.  Alguire has ten years of experience operating a tow truck and repairing automobiles.  Id. at 30-31

Alguire was involved in an automobile accident in 1998, resulting in back pain which "ha[s] gotten progressively worse."  Dkt. No. 11 at 4.  He worked for ten years following the accident.  Dkt. No. 8-7 at 238.  He has pain in his lower and middle back which radiates down both legs beneath the knees.  Dkt. 8-2 at 32.  The pain he experiences is "constant.  Sometimes worse than others."  Id.  Alguire has tried a variety of treatments, including injections, ablations, epidural blocks and physical therapy.  Id.  His doctors recommend

---

[2] Unless otherwise noted, citations to page numbers refer to the pagination generated by CM/ECF, not the page numbers chosen by the parties.

surgery, but Alguire is "trying to put [it] off." Id. at 32. He wears a back brace for one half hour every day. Id. Alguire has a TENS unit which provides temporary relief. Id. at 34. He is currently taking four to six Percocet pills a day for pain. Id. Alguire cannot carry laundry baskets down the stairs, do dishes, vacuum, or do much yard work. Id. at 34-35. He can sweep, and use the microwave. Id. at 35. Alguire's average day includes watching television in his recliner, "[g]et up, walk around a little bit. Sit back down. Lay down." Id. He can no longer fish, hunt, do "outdoor stuff," "drive in a car a lot," or work. Id. He can go grocery shopping with his wife, but needs to "sit down a couple times through it." Id. Alguire gets headaches two to three times per week, which "last for quite a period of time[,] "[s]ometimes half the day." Id. at 46. When he has a headache, he feels nauseous and needs to lay down, in complete silence, with the lights off. Id.

## B. Procedural History

On December 21 2011, Alguire filed a Title II application for a period of disability and disability insurance benefits with an onset date of February 13, 2011. Dkt. No. 8-2 at 12. That application was denied on February 27, 2012. Id. On April 12, 2012, Alguire filed a written request for a hearing. Id. On April 24, 2013, a hearing was conducted before Administrative Law Judge ("ALJ) Bruce S. Fein. Id. In a decision dated July 26, 2013, the ALJ found that Alguire was not entitled to disability benefits. Dkt. No. 8-2. Alguire filed a timely request for review. Dkt.No. 8-2 at 7. On October 29, 2014, the Appeals Council denied Alguire's request, finalizing the ALJ's determination. Dkt. No. 8-2 at 2-4. Thereafter, Alguire commenced this action. See Compl.

### C. Examinations and Consultations

### 1. Dr. Michael Borello

On January 27, 2006 Alguire saw Dr. Michael Borrello at Fletcher Allen Health Care, Division of Pain Management, for treatment for low back pain. Dkt. No. 8-7 at 126. He was diagnosed with lumbar degenerative disk disease. Id. Dr. Borello administered lumbar medial branch blocks at L4 and L5. Id. Alguire next saw Dr. Borrello on February 6, 2006. Id. at 124. He advised Dr. Borrello that the procedures on January 27, 2006 provided him with seventy-five percent pain relief in his lower back, which lasted for three hours. Id. The pain in his lower back was exacerbated by sitting and driving. Id. Dr. Borrello performed radio frequency ablation, bilaterally at L4, L5 and sacral locations. Id.

### 2. Dr. Bedros Bakirtzian - Seaway Orthopedics

Alguire saw Dr. Bedros Bakirtzian at Seaway Orthopedics on September 30, 2010. Dkt. No. 8-7 at 6. He complained of pain in his lower back radiating down his legs bilaterally. Id. Dr. Bakirtzian diagnosed Alguire with low back pain and tight hamstring muscles. Id. He referred Alguire to physical therapy. Id. at 7.

Alguire next saw Dr. Bakirtzian on October 28, 2010. Dkt. No. 8-7 at 4. Alguire reported that physical therapy provided him with a few hours of pain relief. Id. He continued to experience pain down his legs. Id. Dr. Bakirtzian directed Alguire to continue his physical therapy and sent him for an MRI of his lumbosacral spine. Id. at 4-5.

On November 1, 2010, Dr. Susan Daye of Seaway Orthopedics performed an MRI of Alguire's lumbrosacral spine. Dkt. No. 8-7 at 8. The impression was "small diffuse bulging

disc with mild bilateral forminal encroachment at L5-S1.  There is no evidence of spinal

stenosis.  Transitional vertebra with lumbarization of S1 bilaterally."  Id.

Alguire last saw Dr. Bakirtzian on November 4, 2010.  Dkt. No. 8-7 at 2.  Alguire had

tightness in his hamstrings, normal range of motion in his hips, knees, and ankles.  Id.  A

neurological examination of his lower extremities was within normal limits.  Id.  He was sent

for physical therapy and prescribed a home exercise program.  Id.  Alguire was released to

return to work in two to three weeks' time.  Id.


### 3.  Paul Roa, M.D., Chaplain Spine & Pain Management

On December 6, 2010, Alguire presented to Paul Roa, M.D. for an initial pain

management consultation.  Dkt No. 8-7 at 9.  Alguire  reported lower back pain, with an

average pain level of six out of ten, and at worst, a pain level of nine out of ten.  Id.  The

pain radiated down his legs to the knees.  Id.  Alguire's pain was made worse by "walking,

standing and riding."  Id.  On examination, Dr. Roa found Alguire in no acute distress with

pain in his lower back which worsened with twisting and bending.  Id. at 10.  Dr. Roa found

that Alguire has facetogenic pain and would benefit from a bilateral medial  branch block at

L3-4, L4-5 and L5- S1.  Id.

Dr. Roa  examined Alguire on February 23, 2011.  Dkt. No. 8-7 at 22.  At that time,

Alguire reported that he was "happy with the injections," as he had "mild pain, but only while

doing activities."  Id. at 22.  Dr. Roa prescribed a back brace to provide stability and prevent

further injury.  Id.  On February 12, 2012, Dr. Roa performed a nerve conduction study.  Id.

at 37-39.  The nerve conduction study revealed evidence of compression of the bilateral L4

nerve roots.  Id. at 37.  That finding was consistent "with a bilateral lumbar radiculopathy affecting the L 4 nerve roots."  Id.  Dr. Roa next saw Alguire on April 3, 2012, when he performed bilateral L3-4, L5-S1 radio frequency ablation.  Id. at 47.

### 4.  Thierry Bonnabesse, M.D. and Kirsten Berggren, N.P.<br>Champlain Spine and Pain Management

On December 7, 2010, Dr. Thierry Bonnabesse of Champlain Spine and Pain Management administered to Alguire bilateral lumbar medial branch blocks at L3-4, L4-5 and L5-S1.  Dkt. No. 8-7 at 12.  The blocks were directed to Alguire's low back pain.  Id.  Dr. Roa next saw Alguire on January 12, 2011.  Id. at 14.  Alguire reported that he did very well for the first twenty days but the lower back pain returned with increased activity.  Id.  Alguire reported his average pain at a six out of ten.  Id.  Dr. Roa believed Alguire continued to experience "facetogenic pain" due to "some L5-S1 disc protrusion with bilateral forminal encroachment of the L5-S1. . . ."  Id.

Dr. Bonnabesse administered L5- S1 epidural steroid injections on January 12, January 26, and February 9, 2011.  Dkt. No. 8-7 at 16-21.  Alguire saw Kirsten Berggren, a certified nurse practitioner in Dr. Bonnabesse's office, for a follow up visit on June 15, 2011. Id. at 323.  Alguire reported that the lower back pain was returning, particularly first thing in the morning.  Id.  He complained of radicular pain in the right leg.  Id. at 23-24.  Alguire reported that he wears a back brace while doing dishes, but still has "quite a bit of pain with doing dishes."  Id. at 23.

On June 28, 2011, Dr. Bonnabesse performed bilateral lumbar medial blocks at L3-4, 4-5, and L5-S1 to address Alguire's continued low back pain.  Dkt. No. 8-7 at 25.  On July 12, Alguire was seen for a follow-up by Nurse Berggren.  Id. at 27.  Alguire advised that the

injection had helped quite a bit with the low back pain in the morning.  Id.  He continued to experience low back pain later in the day.  Id.  Alguire reported that he had recently finished moving and "has been doing a lot more lifting than usual to try to get settled in the new house."  Id.  Alguire's prescription for Percocet was increased to a maximum of five tablets per day.  Id.

On December 21, 2011, Alguire visited nurse Berggren for a follow-up visit.  Dkt. No. 8-7 at 34.  Alguire reported that the injections had helped his morning pain by seventy percent.  Id. The injections had not helped the evening pain, but he was "pleased with the outcome of the injections, because the morning is the most difficult time for him."  Id.  He was taking Percocet, Celebrex and Gabapentin to address his pain.  Id.  He reported that the medications were "helping him quite a bit[,]" and that Celebrex "is making the biggest difference for him, and he takes two tabs daily."  Id.

Nurse Berggren saw Alguire on May 1, 2012 for a follow-up visit.  Dkt. No. 8-7 at 82. Alguire indicated he had gotten "excellent" relief from a "bilateral RFA at the L3/4, 4/5 and L5/S1 on 4/3/12" and "was very happy with the procedure."  Id.  Alguire indicated feeling seventy-five percent better.  Id.  He continued to have some pain mainly in his low back, which he "managed with the pain medication."  Id.  Alguire was not experiencing any leg pain.  Id.  When Alguire visited nurse Berggren on June 4, he reported that he was doing "extremely well" and was feeling "much better with walking in the morning."  Id. at 84.  He continued to experience some leg pain when he was on his feet too long.  Id.  On September 4, Alguire's low back was doing "pretty well" but he is experiencing central  back pain which was particularly "bothersome for him and this is worse when he is doing the dishes."  Id. at 85.  Alguire admitted that he "may sometimes overdoes it" when his back is

feeling better.  Id.

On October 24, 2012, Alguire underwent an MRI which revealed a grade four annular tear at L4-L5 and a grade three annular tear at L3-L4.  Dkt. No. 8-7 at 63.  He underwent a second MRI on January 9, 2013 which revealed a disc bulge present at L5-S1 contacting both traversing S1 nerve roots, narrowing both lateral recesses with no central stenosis present.  Id. at 61-62.

Nurse Berggren saw Alguire on January 15, 2013.  Dkt. No. 8-7 at 93.  Alguire reported that the trigger point injection which he received at his last appointment had relieved his muscle spasms; however, he continued to experience low back pain across his hips and down his legs bilaterally in the back aspect.  Id.  It was recommended that he have another radiofrequency ablation at L3-4, 4-5, and L5-S1.  Id.

Alguire's last treatment with Champlain Spine and Pain Management was on April 8, 2013, when he was seen by nurse Berggren.  Dkt. No. 8-7 at 158.  Alguire's pain medication was changed to Endocet and he was advised that he could take one or two Tylenol with that medication.  Id.  At that time, he was awaiting approval for another radio frequency ablation treatment.  Id.

On May 1, 2012, Nurse Berggren completed a "complete medical report (physical)" as well as a medical source statement addendum.  Dkt. No. 8-7 at 54-60.  Alguire was diagnosed with lumbar myofascial pain syndrome, lumbar facet arthropathy and lumbar radiculopathy.  Id. at 54.  As a result of his back problems, Nurse Berggren indicated that Alguire is limited to carrying less than ten pounds occasionally and frequently.  Id.  He is limited to standing less than two hours in an eight-hour workday.  Id.  Alguire can sit less than six hours in an eight-hour workday, periodically alternating sitting and standing to

-8-

reduce discomfort. Id. at 56. He cannot climb, crawl, or stoop during an eight-hour workday. Id. He is limited in his ability to reach in all directions, and can only do so occasionally. Id. at 57. The pain which Alguire experiences is present to such an extent that it is distracting to the adequate performance of daily work activities. Id. at 59. Alguire's medications severely limit his effectiveness in the workplace due to drowsiness, inattention and distraction. Id. Nurse Berggren provided that Alguire has had a "[p]ositive response to injection therapy" and "will require ongoing treatment to contoel pain." Id. at 56. Alguire was limited in his ability to be near temperature extremes, humiditiy/wetness, and hazards such as machinery and heights. Id. at 58. Nurse Berggren indicated that the temperature increases Alguire's pain. Id. Nurse Berggren provided that she was "unable to determine [Alguire's] prognosis at this time." Id. at 54. On March 21, 2013, Nurse Berggren completed a Complete Medical Report (Physical). Id. at 128. Dr. Bonnabesse also signed this report. Id. Nurse Berggren indicated that Alguire was first seen on December 6, 2010 and last treated on January 15, 2013. Id. The diagnosis is lumbar facet arthropathy and lumbar radiculopathy. Id. Alguire received spinal injections which provided relief. Id. Nurse Berggren was unable to determine the prognosis for Alguire. Id.

On March 21, 2013, Nurse Berggren and Dr. Bonnabesse both signed a Medical Report (physical), a Medical Source Statement of Ability to do Work Related Activities (physical) ("MSS"), Clinical Assessment of Pain, and an MSS Addendum. Dkt. No. 8-7 at 129-34. The March 21, 2013 MSS states that Alguire is limited in his ability to lift and carry. Id. at 129. He can stand less than two hours in an eight-hour workday. Id. Alguire can sit less than six hours in an eight-hour workday and must periodically alternating sitting and standing to reduce discomfort. Id. at 130. Alguire cannot engage in activities which involve

climbing, crawling, or stooping.  Id.  As a result of his back strain, he is limited in his ability to reach all directions, including overhead.  Id. at 131.  Alguire should limit his exposure to temperature extremes, humidity/wetness, and hazards such as machinery and heights.  Id. at 132.  It is Dr. Bonnabesse's opinion that these limitations were first present in 2009.  Id. at 134.

### 5.  Dr. Robi Rosenfeld - Consultative Internal Medical Examiner

Dr.Robi Rosenfeld performed a consultative internal medical examination on Alguire on January 31, 2012.  Dkt. No. 8-7 at 44.  Alguire advised that he had broken his back in an automobile accident in 1998.  Id.  Alguire worked for ten years after the accident.  Id.  The pain in his back worsened over time.  Id.  During the day, the back pain is a seven on a scale of ten, and a three out of ten in the evening.  Id.  The pain in Alguire's back is constant and does not radiate down his legs.  Id.  Alguire indicated that, due to nerve damage of his low back, his tendons and muscle in his thighs are shortened, and as a result of the shortening of the muscles and tendons, he cannot completely straighten out his legs. Id.  Alguire advised Dr. Rosenfeld that he has dysphagia which makes it difficult to swallow solid foods or thick liquids.  Id.  He has lost fifty pounds in the last two years.  Id.

Alguire reported that he showers and dresses daily.  Dkt. No. 8-7 at 45.  He does the laundry once or twice a week.  Id.  He watches television, listens to the radio, reads, and socializes with his friends.  Id.  On examination Alguire appeared to be in no acute distress. Id.  He had a normal gait and could walk heel and toes without difficulty.  Id.  Alguire was not using any assistive device and could change for the examination without assistance. Id.  He was able to rise from the chair without assistance.  Id.

Dr. Rosenfeld found that Alguire's cervical spine shows "full flexion, extension, lateral flexion bilaterally and full rotary movement bilaterally." Dkt. No. 8-7 at 46. In the lumbar spine, he showed limited flexion but full extension, full lateral flexion bilaterally, and full rotary movement bilaterally. Id. He has full range of motion of his hips and ankles bilaterally. Id. Alguire had difficulty straightening his leg due to hamstring pull in pain on the posterior of both thighs. Id. Dr. Rosenfeld diagnosed Alguire with dysphagia, low back pain and shortened hamstrings. Id. at 47. He characterized Alguire's prognosis as fair. Id. Dr. Rosenfeld found that Alguire "has a mild restriction for heavy lifting and carrying because of the herniated lumbar discs and shortened hamstring muscles of both thighs." Id.

### 6. M. Timpson

Single decision-maker M. Timpson[3] prepared a Physical Residual Functional Capacity ("RFC") assessment dated February 24, 2012. Dkt. No. 8-3 at 2. Timpson reviewed the medical records, but did not examine Alguire. Id. at 3. Timpson's assessment indicates Alguire's primary diagnosis is lumbar myofascial pain syndrome. Id. at 2. Timpson contends that Alguire has the ability to occasionally lift or carry twenty pounds and frequently lift or carry ten pounds. Id. He is able to walk for about six hours in an eight-hour workday and sit about six hours in any eight-hour workday. Id. He is occasionally limited posturally and has no manipulative or environmental limitations. Id.

### II. Discussion

---

[3] It is unclear from the administrative transcript M. Timpson's medical qualifications or background. Dkt. No. 8-2 at 2.

## A. Standard of Review

In reviewing a final decision of the Commissioner, a district court may not determine de novo whether an individual is disabled. See 42 U.S.C. §§ 405(g), 1383(c)(3); Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied, or it was not supported by substantial evidence. Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982). Substantial evidence is "more than a mere scintilla," meaning that in the record one can find "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal citations omitted)). If supported by substantial evidence, the Commissioner's finding must be sustained, "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citation omitted).

"In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision." Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 72 (N.D.N.Y. 2005) (citing Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984)). However, a court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. See Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998). If the Commissioner's finding is supported by substantial evidence, it is conclusive. 42 U.S.C. § 405(g), as amended; Halloran, 362 F.3d at 31.

## B. **Determination of Disability**[4]

"Every individual who is under a disability shall be entitled to a disability . . . benefit . . . ." 42 U.S.C. § 423(a)(1) (2004). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." Id. § 423(d)(1)(A). A medically- determinable impairment is an affliction that is so severe that it renders an individual unable to continue with his or her previous work or any other employment that may be available to him or her based upon age, education, and work experience. Id. § 423(d)(2)(A). Such an impairment must be supported by "medically acceptable clinical and laboratory diagnostic techniques." Id. § 423(d)(3). Additionally, the severity of the impairment is "based [upon] objective medical facts, diagnoses or medical opinions inferable from [the] facts, subjective complaints of pain or disability, and educational background, age, and work experience." Ventura v. Barnhart, No. 04-CV-9018 (NRB), 2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) (citing Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983)).

The Second Circuit employs a five-step analysis, based on 20 C.F.R. § 404.1520, to determine whether an individual is entitled to disability benefits:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.
>
> If he [or she] is not, the [Commissioner] next considers whether the claimant has a 'severe impairment' which significantly limits his

---

[4] Although the SSI program has special economic eligibility requirements, the requirements for establishing disability under Title XVI, 42 U.S.C. § 1382c(a)(3)(SSI) and Title II, 42 U.S.C. § 423(d) (Social Security Disability Insurance ("SSDI")), are identical, so that "decisions under these sections are cited interchangeably." Donato v. Sec 'y of Health and Human Services, 721 F.2d 414, 418 n.3 (2d Cir. 1983) (citation omitted).

> [or her] physical or mental ability to do basic work activities.
>
> If the claimant suffers such an impairment, the third inquiry is
> whether, based solely on medical evidence, the claimant has an
> impairment which is listed in Appendix 1 of the regulations.  If the
> claimant has such an impairment, the [Commissioner] will consider
> him [or her] disabled without considering vocational factors such
> as age, education, and work experience; the [Commissioner]
> presumes that a claimant who is afflicted with a 'listed' impairment
> is unable to perform substantial gainful activity.
>
> Assuming the claimant does not have a listed impairment, the
> fourth inquiry is whether, despite the claimant's severe
> impairment, he [or she] has the residual functional capacity to
> perform his [or her] past work.
>
> Finally, if the claimant is unable to perform his [or her] past work,
> the [Commissioner] then determines whether there is other work
> which the claimant could perform.

Berry, 675 F.2d at 467 (spacing added).  The plaintiff bears the initial burden of proof to

establish each of the first four steps.  DeChirico v. Callahan,134 F.3d 1177, 1179-80 (2d

Cir. 1998) (citing Berry, 675 F.2d at 467).  If the inquiry progresses to the fifth step, the

burden shifts to the Commissioner to prove that the plaintiff is still able to engage in gainful

employment somewhere.  Id. at 1180 (citing Berry, 675 F.2d at 467).


## C.  ALJ'S Findings

Alguire, represented by counsel, testified at a hearing on April 24, 2013 before  ALJ

Bruce. S. Fein.  Dkt. No. 8-2 at 23-42.  Using the test set forth in 20 C.F.R. § 404.1520, the

ALJ determined that Alguire: (1) "meets the insured status requirements of the Social

Security Act through September 20 , 2013"; (2) "has not engaged in substantial gainful

activity since February 13, 2011, the alleged onset date"; (3) "has the following severe

impairments: lumbar spine degenerative disk disease, lumbar facet arthropathy, and lumbar

radiculopathy"; (4) "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404,Subpart P Appendix 1"; (5) "has the residual functional capacity to lift and carry up to twenty pounds occasionally and ten pounds frequently, sit for six hours in an eight hour workday, and stand/walk for two hours in an eight-hour workday . . . [and] occasionally climb, balance, stoop, kneel, crouch, and crawl."; (6) "has no past relevant work"; (7) "was . . . a younger individual age 18-49, on the alleged disability onset date"; (8) "has a limited education and is able to communicate in English"; (9) "transferability of job skills is not an issue because the claimant does not have past relevant work"; (10) "there are jobs that exist in significant numbers in the national economy that the claimant can perform"; and (11) "has not been under a disability, as defined in the Social Security Act, from February 13, 2011 through the date of this decision." Id. at 12-18.

The ALJ concluded that, although Alguire's medically determined impairments could reasonably be expected to caused the alleged symptoms, "the statements concerning the intensity, persistence and limiting effects of the symptoms are not credible because they are unsupported by medical and other evidence, competent medical opinion, and testimony." Dkt No. 8-2 at 16. The ALJ noted that Alguire had normal gait and stance, could walk on heel and toes without difficulty, and did not require assistance in getting dressed or getting on and off the table during examination. Id. The ALJ gave "significant weight" to the opinion of consultative examiner Dr. Rosenfeld that Alguire has a mild restriction for lifting and carrying. Id. The ALJ found that opinion consistent with the entire record and Alguire's high level of daily activity. Id. The ALJ accorded "limited weight" to the opinions of Dr. Roa and Nurse Berggren, "as the entirety of the record demonstrates that the claimant had

greater functions than those opined." Id. at 15. The ALJ noted, specifically, that "the objective evidence . . . of record on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported. Yet . . . there exists good reasons for questioning the reliability of the claimant's subjective complaints." Id. The ALJ did not address the weight, if any, given to the findings of single decision maker M. Timpson, Dr. Bonnabesse, or any of Alguire's other medical providers. See generally id. at 14-16.

### D. Alguire's Arguments

Alguire contends that the ALJ committed reversible error by failing to: (1) evaluate and give controlling weight to the opinions of Alguire's treating physicians; (2) properly consider Alguire's pain, physical limitations and other symptoms in making his determination; and (3) properly evaluate Alguire's residual functional capacity. See Dkt. No. 11 at 1-2.

### 1. Treating Physician Rule

Alguire contends that  ALJ erred when he failed to give controlling weight to the opinions of his treating physicians . Dkt. No. 11 at 14-18.

 Under the "treating physician's rule," the ALJ must give "controlling weight" to the treating physician's opinion when the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. 20 C.F.R. § 404.1527(d)(2); Halloran v. Barnhart, 362 F.3d 28, 31-32 (2d Cir. 2004); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir.  2000). Although the treating physician

rule need not be applied if the treating physician's opinion is inconsistent with opinions or other medical records, "not all expert opinions rise to the level of evidence that is sufficiently substantial to undermine the opinion of the treating physician." Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008). Even when the treating physician's opinion is not given controlling weight, an ALJ "must consider various 'factors' to determine how much weight to give to the opinion[,]" including: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors . . . . " Hallorhan, 362 F.3d at 32 (quoting 20 C.F.R. § 404.1527(c)(2)). The ALJ is also required to set forth his or her reasons for the weight he or she assigns to the treating physician's opinion. Id. The Second Circuit has stated that it will "not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion." Halloran, 362 F.3d at 33; Brogan-Dawley v. Astrue, 484 F. App'x 632, 633 (2d Cir. 2012). However, "where the evidence of record permits [the court] to glean the rationale of an ALJ's decision," the ALJ need not "have mentioned every item of testimony presented to him [or her] or have explained why he [or she] considered particular evidence unpersuasive or insufficient to lead him [or her] to a conclusion of disability." Petrie v. Astrue, 412 F. Appx. 401, 407 (2d Cir. 2011). Ultimately, the final determination of disability and a claimant's ability to work rests with the Commissioner. Snell v. Apfel, 177 F.3d 128, 133-34 (2d Cir. 1999); 20 C.F.R. § 404.1527(e) (2005).

Alguire contends that the ALJ erred when he failed to give controlling weight to the

opinions of Dr. Roa and Dr. Bonnabesse. Dkt. No. 11 at 11-5. Alguire further argues that the ALJ improperly relied on an opinion from the consultative examiner, instead of adopting the opinions from Dr. Roa and Dr. Bonnabesse. Id. at 12-15. The undersigned agrees the ALJ's application of the treating physician rule to the opinions of Dr. Roa and Dr. Bonnabesse is flawed.[5] Contrary to the ALJ's conclusory statement that "[t]he objective evidence of record . . . fails to support the level of severity alleged[,]" clinical diagnostic tests from Dr. Roa and Dr. Bonnabesse, as well as from other physicians of record, support their diagnosis of a serious back impairment with resulting limitations. Id. at 15. Dr. Roa and Dr. Bonnabesse are specialists in spine and pain management, and they provided Alguire with extensive treatment between December 6, 2010 and April 18, 2013. As such, they are Alguire's treating physicians whose opinions were entitled to controlling weight as long as they were well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record. See generally, Jonas v. Apfel, 66 F. Supp. 2d. 518, 524-525 (S.D.N.Y. 1999); 20 C.F.R. § 404.1527(d)(2).

Dr. Roa and his partner, Dr. Bonnabesse, saw Alguire on over twenty times. Dkt. No. 8-7 at 9-33, 243-288, 352-353. During that period, Dr. Roa and Dr. Bonnabesse examined Alguire on numerous occasions and also ordered that MRIs be conducted and reviewed the reports. Id. They also treated Alguire for pain management, performed ablation surgery, and ordered that nerve conduction studies be conducted in an effort to address Alguire's back pain

---

[5] The decision of the ALJ makes no reference to the weight given to Dr. Bonnabesse's opinion. The ALJ erroneously attributed the opinions contained in the May 1, 2012 Complete Medical Report (Physical), Dkt. No. 8-7 at 54, and the Complete Medical Report (Physical), Dkt. No. 8-7 128, to Dr. Roa. Each of the complete medical report forms is signed by Nurse Berggren and includes the initials "TB." Id. The parties agree that the initials "TB" are for Dr. Bonnabesse. See Dkt. Nos. 11 at 16, 15 at 12.

and limitations.  Id.  Imaging studies also support these doctors' opinions.  On November 1, 2010, Dr. Susan Daye of Seaway Orthopedics performed an MRI.  Dkt. No. 8-7 at 8.  The MRI findings included "L5-S1 disc desiccation and small diffuse bulging disc, with mild bilateral forminal encroachment."  Id.  The diagnostic impression is a small diffuse bulging disc with mild bilateral forminal encroachment at L5.  Id.  An MRI of Alguire's lumbar spine was conducted at the Champlain Valley Physicians Hospital Medical Center on October 24 2012.  Dkt. No. 8-7 at 63.  The scan found that at " L 3-L 4: there is a grade 3 annular tear seen in the right lateral recess location . . . . L5-S1: There is a grade 3 annular tear posterior centrally.  There is no extravasation."  Id.  An MRI of Alguire's lumbar spine taken on January 9, 2013 found "a disc bulge . . . present at L5-S1 contacting both traversing S1 nerve roots and narrowing both lateral recesses.  There is no central stenosis."  Id.  On February 12, 2012, Dr. Roa performed a nerve conduction study.  Dkt. No. 8-7 at 37-39.  That study revealed evidence of compression of the bilateral L4 nerve root which is consistent "with a bilateral lumbar radiculopathy affecting the L4 nerve roots."  Id.  The results of the nerve conduction study provide additional support for the opinions of Dr. Roa and Dr. Bonnabesse.

Further, Dr. Bonnabesse completed a medical report (physical) which reflects a diagnosis of "lumbar facet arthropathy and lumbar radiculopathy."  Dkt. No. 8-7 at 128.  Dr. Bonnabesse was unable to determine Alguire's prognosis at that time.  Id.  She also completed a medical source statement of ability to do work related activities (physical).  Id. at 129.  The MSS reflects that Alguire is limited in his ability to lift and carry.  Id.  Dr. Bonnabesse opined that Alguire can stand for less than two hours in an eight hour workday and can sit less than six hours in an eight hour workday.  Id.  She further indicated that, while working, Alguire must be able to periodically alternate sitting and standing to reduce to reduce discomfort.  Id. at 130.

Alguire must avoid twisting and bending when lifting.  Id.  He must never climb, stoop, or crawl.  Id.  Alguire's limitations are the result of his back strain.  Id.  It is Dr. Bonnabesse's opinion that these limitations were first present in 2009.  Id. at 134.

Although the ALJ indicates that he is according less weight to the findings of Dr. Roa[6] and Nurse Berggren[7] because they "apparently relied quite heavily on the subjective report of symptoms and limitations provided by [Alguire], and seemed to uncritically accept as true most, if not all, of what [Alguire] reported," T at 15, "none of [Alguire's] treating providers have ever questioned the presence of [his] pain."  Arrington v. Astrue, 09-CV-870 (AF), 2011 WL 3844172, at *14 (W.D.N.Y. Aug. 8, 2011) (citing Carlisle v. Barnhart, 392 F. Supp. 2d 1287, 1294 (N.D. Ala. 2003).  There is no evidence in the record from any medical provider that there were signs of malingering.  Id.

As the opinions of Dr. Roa and Dr. Bonnabesse are well supported by their treatment of Alguire on over twenty occasions, as well as a variety of diagnostic tests, the ALJ erred in failing to give controlling weight, or greater than "limited weight" to their opinions.  Dkt. No. 8-2 at 16.  The undersigned therefore recommends that this matter be remanded with instructions to the ALJ to set forth "good reasons" should he wish to discount the opinions of the treating physicians, and if necessary, the ALJ should contact Alguire's treating physicians to clarify the basis for their opinions as to Alguire's limitations.

---

[6]  Again, as indicated supra, it seems that the ALJ meant to refer to the opinion of Dr. Bonnabesse here.

[7]  The undersigned acknowledges that Nurse Berggren is not an acceptable medical source, but rather an "other source"; thus, her opinion is not entitled to controlling weight.  However, as a nurse practitioner who met and treated Alguire with great frequency, her opinions should be considered and evaluated "on key issues such as impairment severity and functional effects[.]" SSR 06-03p.

## 2. RFC

As noted, the ALJ opined that Alguire could lift and carry up to twenty pounds occasionally and ten pounds frequently; sit for six hours in an eight hour day; stand/walk for six hours in an eight hour day; and occasionally climb, balance, stoop, kneel, crouch, and crawl. Dkt. No. 8-2 at 14. An RFC finding can withstand judicial scrutiny only if there is substantial evidence in the record to support each requirement listed in the regulations. Martone v. Apfel, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999). When assessing a plaintiff's RFC, the ALJ "must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis . . . . Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." SSR 96-8p, Police Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capcity In Initial Claims, 1996 WL 374184, at *1 (July 2, 1996). The ALJ must assess a plaintiff's ability "to perform each of seven strength demands: Sitting, standing, walking, lifting, carrying, pushing, and pulling." Id. at *5. In addition, the ALJ "must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform . . . ." Id. at *7 (internal footnote omitted).

It is unclear the medical evidence on which the ALJ relied in reaching his determinations as to Alguire's function-by-function abilities. "[A]n RFC assessment is not considered to be substantial evidence when it is not completed by a treating physician." Colon v. Astrue, 09-CV-6527, 2010 WL 2925969, at *3 (W.D.N.Y. July 23, 2012) (citing Fagon v. Sullivan, No. 88-315, 1989 WL 280336 (D. Vt. Nov. 21, 1989)). Further, although an ALJ may rely on the opinion of

a consultative examiner to support an RFC assessment, as consultative examiners and state agency physicians are deemed qualified experts in social security disability, <u>Monguer v. Heckler</u>, 722 F.3d 1033, 1039 (2d Cir. 1983), here, the reports from consulting examiners and state agency physicians provide little in the way of substantial evidence to support the ALJ's findings. The only examining consultative examiner is Robi Rosenfeld, D.O., whose opinion as to Alguire's limitations – that Alguire has "a mild restriction for heavy lifting and carrying" – the ALJ conceded was "vague." Dkt. No. 8-2 at 15. Further, Dr. Rosenfeld does not discuss Alguire's imaging studies.[8] <u>Id.</u> at 238-41. Although non-examining state agency consultant M. Timpson opined that Alguire could occasionally lift twenty pounds, frequently lift ten pounds, stand/walk for six out of eight hours, sit for six out of eight hours, and has no limits on pushing or pulling, Dkt. No. 8-3 at 2-8, the ALJ did not acknowledge this opinion or explain any weight he may have accorded to it. Dkt. No. 8-2 at 14. Although the ALJ's failure to address the weight accorded to this state agency consultant does not appear to be error <u>per se</u>, it appears that the ALJ did, in fact, rely on M. Timpson's opined limitations significantly, as the ALJ's RFC assessment largely mirrors these opined limitations. Dkt. No. 8-2 at 14-16.

Here, although the ALJ accorded significant weight to Dr. Rosenfeld's opinion, he admitted it was vague and the opinion did not address imaging studies. As for M. Timpson's opinion, although it set forth a function-by-function assessment, the ALJ did not even address this opinion in his determination and it is an opinion by an individual who did not examine Alguire. Thus, it is unclear to the undersigned what medical opinions the ALJ relied upon in

---

[8] The undersigned does note that there is a handwritten note on the third page of Dr. Rosenfeld's examination stating "L-S Spine Xray: Negative." Dkt. No. 8-7 at 46. However, there is no indication that this note was penned by Dr. Rosenfeld. <u>Id.</u> It is not initialed. <u>Id.</u> Further, the ALJ does not mention this notation. <u>Id.</u>

reaching plaintiff's RFC. Although an ALJ is not required to accord controlling weight to the opinions of Alguire's treating physicians, the ALJ "is not permitted to substitute her [or his] own expertise for a competent medical opinion." Stokes v. Astrue, 10-CV-11129 (MAD), 2012 WL 695856, at *12 (N.D.N.Y. Mar. 1 2012). Rather than accept the medical providers' interpretation of the imaging studies and diagnostic testing, the ALJ took it upon himself to assess their meaning. However, "[a]n ALJ is not qualified to assess a claimant's RFC on the basis of bare medical findings, and as a result an ALJ's determination of RFC without a medical advisor's assessment is not supported by substantial evidence." Dailey v. Astrue, 09-CV-99, 2010 WL 4703599, at *11 (W.D.N.Y. Oct. 26, 2010) (internal citation and quotation marks omitted) (citing Suide v. Astrue, 371 F. App'x 684, 689-90 (7th Cir. 2010) (holding that "the evidentiary deficit" left by the ALJ's rejection of a physician's reports, requires remand where the "rest of the record simply does not support the parameters included in the ALJ's [RFC] determination, such as an ability to 'stand or walk for six hours' in a typical work day.")).

Accordingly, as the undersigned determines that this matter need be remanded, it is recommended that, on remand, the ALJ clearly set forth the medical opinions on which he is relying to reach a function-by-function assessment of Alguire's specific abilities. Further, the ALJ is to make clear the weight he accords to each medical opinion.


### 3. Credibility Analysis

20 C.F.R. § 404. 1529 (a) requires that an ALJ consider both subjective and objective evidence in assessing a claimant's symptoms to determine disability. When there is conflicting evidence regarding a material issue such as a claimant's pain or other disability, the ALJ must evaluate the claimant's credibility. See, e.g., Orton v. Astrue, 11-CV-630 (FJS/ATB), 2013 WL

3328025, at *8 (N.D.N.Y. July 2, 2013); Snell v. Apfel, 177 F.3d 128,135 (2d Cir. 1999).  As the

Second Circuit set forth in Meadors v. Astrue, 370 F. App'x 170, 183-84 (2d Cir. 2010),

> [e]vidence of pain is an important element in the adjudication of DIB and SSI claims, and must be thoroughly considered in calculating the RFC of a claimant.  See Lewis v. Apfel, 62 F.Supp.2d 648, 657 (N.D.N.Y. 1999).  "[S]ymptoms, including pain, will be determined to diminish [a claimant's] capacity for basic work activities to the extent that . . . [they] can reasonably be accepted as consistent with the objective medical evidence and other evidence."  20 C.F.R. § 404.1529(c)(4).    To that end, the Commissioner has established a two-step inquiry to evaluate a claimant's contentions of pain. See Social Security Ruling 96-P, 1996 WL 374186 (S.S.A.); 20 C.F.R. § 404.1529(c).  First, the ALJ must determine whether the claimant suffers from a "medically determinable impairment[ ] that could reasonably be expected to produce" the pain alleged. 20 C.F.R. § 404.1529(c)(1); see SSR 96-P.    Second, the ALJ must evaluate the intensity and persistence of those symptoms considering all of the available evidence; and, to the extent that the claimant's pain contentions are not substantiated by the objective medical evidence, the ALJ must engage in a credibility inquiry.  See 20 C.F.R. § 404.1529(c)(3)(i)-(vii); Taylor v. Barnhart, 83 Fed. Appx. 347, 350-51 (2d Cir. 2003) (summary order).

In assessing a claimant's credibility, an ALJ must consider the objective medical evidence, as

well as evidence concerning: (1) the plaintiff's daily activities; (2) the location, duration,

frequency and intensity of the plaintiff's pain or other symptoms; (3) factors that precipitate or

aggravate the symptoms; (4) the type, dosage, effectiveness and side effects of plaintiff's

medications; (5) other means of pain relief received by the plaintiff; (6) non-treatment measures

used by plaintiff for pain relief; and (7) any other factors concerning the individual's functional

limitations and restrictions.  See 20 C.F.R. §§ 404.1529, 416.929.  The ALJ must present the

reasons for his credibility determination with sufficient specificity to allow the reviewing court

to decide whether that determination is supported by substantial evidence.  Id.  In making the

credibility determination, "[t]he issue is not whether the clinical and objective findings are

consistent with an inability to perform all substantial activity, but whether plaintiff's statements about the intensity, persistence, or functionally limiting effects of his symptoms are consistent with the objective medical and other evidence." Saxon v. Astrue, 781 F. Supp. 2d 92, 105 (N.D.N.Y. Mar. 4, 2011) (citing SSR 96-7p, 1996 WL 374186, at *2 (S.S.A. July 2, 1996)).

Here, the ALJ found that Alguire's medically-determinable impairments could be expected to cause the alleged symptoms, " however the statements concerning the intensity, persistence in limiting effects of the symptoms are not credible because they are unsupported by medical or other evidence, competent medical opinion and testimony." Dkt. No. 8-2 at 16. Alguire argues that the ALJ failed to apply the appropriate legal standards when he found him less than fully credible. Dkt. No. 11 at 19-22. He further contends the ALJ disregarded objective and clinical evidence in the record which supports Alguire's testimony regarding the nature and extent of his back impairment. Id. at 21.

The undersigned has recommended that this matter be remanded based on the ALJ's failure to properly apply the treating physician rule. "The ALJ's proper evaluation of [the treating physician's] opinions will necessarily impact the credibility analysis. Thus, the credibility analysis is necessarily flawed." Mortise v. Astrue, 713 F. Supp.111,12-25 (N.D.N.Y. 2010); see also Crowley v. Colvin, 13-CV-1723 (AJN/RLE), 2014 WL 4631888, *5 (S.D.N.Y. Sept.15, 2014). Despite the undersigned's determination that new credibility assessment will be needed should the matter be remanded, the undersigned finds troubling the great emphasis the ALJ places on the fact that Alguire "showers and dresses daily, does laundry once or twice per week, watches television, listens to the radio, reads and socializes with friends." Dkt. No. 8-2 at 16. The Second Circuit has found that "a claimant need not be an invalid to be disabled." Murdaugh v. Sec'y of Dept. Health-Human Services of U.S. , 837 F.2d. 99,102 (2d Cir.1988).

It is well-settled that the activities such as those engaged in by Alguire do not, by themselves, contradict Alguire's allegations of pain.  See Knighton v. Astrue, 09-CV-991 (NAM/VEB), 2012 WL 951575, at *8 (N.D.N.Y. Mar. 20, 2012).  The undersigned also notes that the ALJ rejects Alguire's credibility almost entirely on his reported activities of daily living, and does not discuss any other factors, such as the methods, measures, and treatments he used to alleviate pain, or the frequency or intensity of his pain.  20 C.F.R. §§ 404.1529, 416.929.

As such, the undersigned recommends that this matter be remanded with an instruction to the ALJ to consider the entirety of the record and apply the treating physician rule before assessing Alguire's credibility.  Should the ALJ find objective medical evidence supporting Alguire's testimony of pain, it should be accorded appropriate weight.  Simmons v. U.S. R.R. Ret. Bd., 982 F.2d 49, 56 (2d Cir.1992) (quoting Rivera v.Schweiker, 717 F.2d 719, 724 (2d Cir. 1983)).  Further, in assessing Alguire's credibility, the ALJ should consider all of the factors set forth in the Regulations.  20 C.F.R. §§ 404.1529, 416.929.

### 3. Step Five Analysis

The ALJ's determination of residual functional capacity consists of two parts.  First, the Commissioner must assess a claimant's job qualifications by considering his or her physical ability, age, education, and work experience.  Second, the Commissioner must determine whether jobs exist in the national economy that a person having the claimant's qualifications could perform.  See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. §§ 416.920(g): 404.1520(g).  The Commissioner has the burden of proof for both parts of step five . See Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

Here, as undersigned has found error in the ALJ's application of the treating physician

rule, the undersigned not determine whether the ALJ erred in Step Five as the error in weighing the medical opinions necessarily affected the step five determination. Accordingly, it is recommended that, on remand, the ALJ must correctly apply the treating physician rule before reaching the step five determination. If the ALJ should reach step five on remand and find that testimony from a vocational expert ("VE") is necessary, it is recommended that the ALJ be directed to present to the VE hypothetical questions that properly reflect any updates made to Alguire's RFC.

## III. Conclusion

**WHEREFORE**, for the reasons stated above, it is hereby

**RECOMMENDED** that the Commissioner's motion for judgment on the pleadings (Dkt. No. 15) be **DENIED**, that plaintiff's motion for judgment on the pleadings be **GRANTED** (Dkt. No. 11), and that the Commissioner's decision denying disability benefits be **REMANDED**, pursuant to 42 U.S.C. § 405(g), to the Commissioner for further proceedings consistent with this Report-Recommendation and Order; and it is

**ORDERED**, that copies of this Report-Recommendation and Order be served on the parties in accordance with the Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have **fourteen (14)** days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Services, 892 F.2d 15 (2d Cir.

1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.


Dated: March 16, 2016
      Albany, New York

Christian F. Hummel
U.S. Magistrate Judge